Larry Kyle DESSELLES, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–95–232–CR.

Court of Appeals of Texas,
Waco.

Nov. 20, 1996.

Paul Guillotte, Jr., Gatesville, for appellant.

Sandy S. Gately, District Attorney, Richard L. Mackay, Jr., Asst. District Attorney, Gatesville, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

A jury convicted the appellant, Larry Kyle Desselles, of the aggravated sexual assault of a child and assessed punishment at sixty years' incarceration in the Texas Department of Criminal Justice–Institutional Division. TEX. PENAL CODE ANN. § 22.021 (Vernon 1994 & Supp.1997). Desselles raises three points of error on appeal: (1) the trial court erred in allowing into evidence a photograph the authenticity of which was not properly established; (2) the trial court erred in allowing medical documents into evidence that were not properly authenticated; and (3) the evidence was factually insufficient to support the judgment. We affirm.

### I. FACTUAL BACKGROUND

The record reveals that on January 5, 1994, Desselles penetrated his four-year-old niece's vagina with his finger. Shannah Schaefer, who is Desselles' sister and the victim's mother, learned of the assault on the evening of the offense while trying to bathe the child. When Schaefer put her in the water, the child started to cry and complained that she was hurting. Schaefer then looked the child over and noticed that her vaginal area was "real red."

Schaefer immediately suspected that Desselles had sexually assaulted the girl. Fearing, however, that he would leave the premises if he learned that she was going to take the child to be examined, Schaefer waited until the next day to see a doctor. On January 6, Schaefer took the child to the emergency room at Darnell Army Community Hospital at Fort Hood. Jamie Winter Walraven, M.D., after conducting a brief preliminary check of the child's eyes, ears, nose and throat, attempted to conduct a genital exam. The child, however, strongly resisted Dr. Walraven's attempts to examine her genital region. Dr. Walraven then referred the child to a pediatrician at the hospital who, similarly, was unable to conduct a genital exam. Either this pediatrician or another pediatrician then decided to schedule the child to have a full genital exam the next day under sedation.

The following day, Dr. Arif Mahood examined the child, who had been sedated for the purpose of the examination, and discovered that her "hymen was absent" and that her "labia majora and minora were erythema-

tous," meaning that the skin around her vagina was unusually red. At some point in time, the matter was referred to Child Protective Services for consideration. An investigation was undertaken by CPS employee Loretta Ferguson, and she determined that the child's actions were consistent with the actions a typical child of her age would have in truthfully relating that he or she had been assaulted.

The criminal investigation in the case began on January 6 when Schaefer reported the incident to the Coryell County Sheriff's Department.

## II. AUTHENTICATION OF THE HOSPITAL RECORDS

 In his second point of error Desselles argues that the trial court erred in admitting into evidence State's exhibits two and three, which consist of documentation of the medical examinations the victim received at Darnell. The record reflects that the State offered the testimony of Sergeant Donna Greene to authenticate these two exhibits. Sergeant Greene attested that she is the medical records' custodian for Darnell. She testified, however, that she did not create the documents comprising State's exhibits two and three and that she is not the head of the personnel department at Darnell. Desselles argues from these statements that Sergeant Greene could not be the custodian of records as contemplated by TEX.R.CRIM.EVID. 803(6).

 It is of no moment that Sergeant Greene neither created the documents nor that she is not the head of the personnel department at Darnell. To authenticate a record of a regularly conducted activity, such as documentation relating to a patient's examination at a hospital, Rule 803(6) does not require that the person authenticating the record be either the creator of the record or to have personal knowledge of the information recorded therein. *Brooks v. State*, 901 S.W.2d 742, 746 (Tex.App.—Fort Worth 1995, pet. ref'd, pet. dism'd). The witness need only to have knowledge of how the records were prepared. *Id.*

Sergeant Greene testified that she keeps all the medical records at Darnell Hospital and that the documents comprising State's exhibits two and three were made in the normal course of business at about the same time as the examination. This testimony was sufficient to meet the authentication requirements under Rule 803(6). Desselles' second point is overruled.

## III. AUTHENTICATION OF THE PHOTOGRAPH

 In his first point Desselles complains that the trial court erred in allowing into evidence an allegedly unauthenticated photograph of the victim. *See* TEX.R.CRIM. EVID. 901. Desselles' complaint, however, was not properly preserved for our review. *See* TEX.R.APP.P. 52(a). To preserve error for review, a specific objection must be made each time an offer of inadmissible evidence is made. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App.1991). Moreover, "[a]n objection to photographic evidence is waived if the same information contained in the photograph[ ] is conveyed to the jury in some other form." *Havard v. State*, 800 S.W.2d 195, 205 (Tex.Crim.App.1989). The complained-of photograph allegedly shows the victim lying on her back on the date she was examined by Dr. Mahood in a "frog-legged position" with her legs spread so that a picture of her vagina could be taken to show the swollen and erythematic condition of the skin around it.[1] Schaefer testified that when she learned of the child's injuries she asked a friend, Lesa Goodwin, who was staying in her home at the time with her three children, also to look at the child's vaginal area. At trial, Goodwin testified without objection that the condition of the vagina pictured in the photograph was essentially the same as the child's vagina on the night she saw the child, although the redness and swelling were not as severe. Moreover, as indicated above, Dr. Mahood stated in his report that the skin around the child's vagina was erythematic when he examined her on January 7. Desselles offered no objection to Dr. Mahood's report that the information contained

---

1. We say "allegedly" because only a black-and-white photocopy of the color original was included in the record. We obviously cannot determine accurately the erythematic condition of the skin around the victim's vagina from a black-and-white photocopy.

therein was the same or duplicative of the information represented in the photograph. By failing to offer such an objection to either Goodwin's testimony or Dr. Mahood's report, Desselles waived his complaint against the photograph. Finding his complaint waived, we overrule his point of error.

## IV. FACTUAL SUFFICIENCY

In his third and final point Desselles argues that the evidence is factually insufficient to support the judgment. He contends that the evidence presented to convict him was entirely circumstantial and that the State failed to present factually sufficient evidence to exclude every reasonable hypothesis but his guilt. He asserts that evidence was admitted that the victim had a habit of inserting toys and other objects into her vagina and that the victim had on three other occasions prior to this offense alleged that two other people and Desselles had sexually assaulted her. Desselles maintains that this evidence could reasonably explain the redness of the skin around her vagina and explain why the child charged that Desselles had sexually molested her.[2] We will at the outset review the present viability of the "outstanding reasonable hypothesis" construct both at the trial court and appellate levels.

## A. Outstanding Reasonable Hypothesis as a Standard to Review the Factual Sufficiency of the Evidence on Appeal

■ The "outstanding reasonable hypothesis" construct at the trial court level is dead in Texas. See Brown v. State, 911 S.W.2d 744, 745–46 (Tex.Crim.App.1995). Prior to the Court of Criminal Appeals' decision in Hankins v. State, 646 S.W.2d 191 (Tex.Crim. App.1983) (on rehearing), the reliability of circumstantial evidence was considered to be more suspect than direct evidence; accord-

ingly, juries in circumstantial evidence cases were required to exclude every reasonable hypothesis but the defendant's guilt in order to convict. See Brown, 911 S.W.2d at 745; Hankins, 646 S.W.2d at 197–98. The Hankins court, following a similar holding under federal law by the United States Supreme Court in Holland v. United States, 348 U.S. 121, 137–39, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954), held that circumstantial evidence can be just as strong and probative as direct evidence and, therefore, rejected the "outstanding reasonable hypothesis" construct as a standard of proof that the juries should consider in circumstantial evidence cases. Hankins, 646 S.W.2d at 199.[3] The court considered that circumstantial evidence frequently is more probative than direct evidence and that, under Texas law, jurors are not required to give more credence to direct evidence than circumstantial. Id. at 198; see Brown, 911 S.W.2d at 745–46. Therefore, reasoned the court, "a jury instruction to treat [circumstantial] evidence differently [than direct evidence] is not ... necessary to protect any rights of the defendant or to accomplish any other important objectives of the [criminal justice] system." Brown, 911 S.W.2d at 746; see Hankins, 646 S.W.2d at 199. With juries then required to treat circumstantial evidence in the same manner that they treat direct evidence, the "outstanding reasonable hypothesis" charge was rendered obsolete.

Eight years later, the Court of Criminal Appeals in Geesa v. State, 820 S.W.2d 154, 159 (Tex.Crim.App.1991), likewise discarded the "outstanding reasonable hypothesis" construct as an appellate standard to review legal sufficiency of the evidence.[4] The Geesa court considered that the use of the reasonable hypothesis standard on appeal was inextricably linked to the "outstanding reasonable hypothesis" jury charges that were

2. The State contends that Desselles' factual sufficiency point was not preserved for our review because he failed to raise his argument first to the trial court. We agree with the El Paso Court of Appeals in Davila v. State, 930 S.W.2d 641, 648–49 (Tex.App.—El Paso 1996, no pet. h.), that factual sufficiency points may be raised for the first time on appeal.

3. The court in Hankins v. State, 646 S.W.2d 191, 199 (Tex.Crim.App.1981) (on rehearing), stated than an instruction on circumstantial evidence was "valueless."

4. The Court of Criminal Appeals referred to its treatment of the "outstanding reasonable hypothesis" construct on appeal as an "interment." Brown v. State, 911 S.W.2d 744, 746 (Tex.Crim. App.1995).

given prior to *Hankins.* *Id.* at 159. The court reasoned that, once the "outstanding reasonable hypothesis" instruction was no longer required in Texas, the very purpose for the "outstanding reasonable hypothesis" analytical construct, either at the trial court or on appeal, no longer existed. *Id.*

We are aware that both *Brown* and *Geesa* were decided prior to the Court of Criminal Appeals' opinion in *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim.App.1996), which recognized the authority of the intermediate courts to conduct factual sufficiency reviews in criminal cases. Accordingly, *Brown* and *Geesa* were looking at the sufficiency of the evidence only from the legal sufficiency standpoint under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and not with regard to an appellate court's duty to review the factual sufficiency of the evidence. But this is a distinction without a difference. *Brown* and *Geesa* jettisoned the "outstanding reasonable hypothesis" as an appellate standard, not because the reviewing court in legal sufficiency cases must view the evidence through the *Jackson* prism, but because circumstantial evidence was considered to stand on an equal plane with direct evidence. *Brown,* 911 S.W.2d at 746; *Geesa,* 820 S.W.2d at 159. There is no doubt that the Court of Criminal Appeals had, prior to *Geesa,* claimed that the "outstanding reasonable hypothesis" standard was a method of applying the *Jackson* standard in Texas, *see Butler v. State,* 769 S.W.2d 234, 238 n. 1 (Tex.Crim.App.1989) (quoting *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex. Crim.App.1983) (on rehearing)), but this rationale was expressly disavowed in *Geesa.* 820 S.W.2d at 159; *see Brown,* 911 S.W.2d at 746. The *Geesa* court explained that the "outstanding reasonable hypothesis" standard required a higher level of proof than is required by "proof beyond a reasonable doubt." *Geesa,* 820 S.W.2d at 159 (citing *Griffin v. State,* 614 S.W.2d 155, 159 n. 5 (Tex.Crim.App. [Panel Op.] 1981)). Therefore, by requiring the State to meet the "outstanding reasonable hypothesis" standard on appeal when the jury was required only to find proof beyond a reasonable doubt to convict at trial, the "outstanding reasonable hypothesis" standard "misappropriate[d]" to the courts of appeal the jury's authority to weigh the evidence. *Geesa,* 820 S.W.2d at 159; *see Brown,* 911 S.W.2d at 746.

■ While, under a factual sufficiency review, the court on appeal does not give such enormous deference to the trier of fact's assessment of the evidence, due deference must still be provided the jury's resolution of conflicts in the testimony and questions of the witnesses' credibility. *Clewis,* 922 S.W.2d at 133; *Davila v. State,* 930 S.W.2d 641, 646–47 (Tex.App.—El Paso 1996, no pet. h.). The intermediate courts' new-found authority to conduct factual sufficiency reviews does not allow us to sit as the "thirteenth juror" in the case. *See Geesa,* 820 S.W.2d at 159. There is no logical reason for an appellate court, in performing a review of the factual sufficiency of the evidence, to examine the evidence in light of a higher burden of proof than the trier of fact applied at trial.[5] Yet, this is exactly what would be achieved by an application of the "outstanding reasonable hypothesis" standard in factual sufficiency cases. The reasoning of the Court of Criminal Appeals in abandoning the "outstanding reasonable hypothesis" standard on appeal applies to both legal and factual sufficiency cases. In conclusion, we hold that there is no need to resurrect the extinct "outstanding reasonable hypothesis" standard.[6]

5. Besides not being required, the "outstanding reasonable hypothesis" standard was criticized by the Court of Criminal Appeals because it was "confusing and unworkable," forcing "facile and counterintuitive" reviews of the evidence. *Brown,* 911 S.W.2d at 746, 748. Unless it is required by law, we see no reason to mandate that such an awkward standard be used. We do not mean to suggest, however, that it could never be used. The court in *Brown* indicated that in some cases the standard may occasionally be a satisfactory means of reviewing the evidence. *Id.* at 746.

6. Considering the issue from another angle, appellate courts continued to make use of the "outstanding reasonable hypothesis" construct between *Hankins v. State,* 646 S.W.2d 191 (Tex. Crim.App.1981) (on rehearing), and *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991), because they thought it might be required under the due process clause to implement *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d

 Therefore, as the Court of Criminal Appeals held in *Clewis*, in conducting a factual review of the evidence, we will reverse and remand for a new trial if, after the viewing all of the evidence in the case, both in favor of and opposed to the verdict, the judgment is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 129 (quoting *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd, untimely filed)). The reviewing court may reverse either because the verdict is based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 519 n. 11 (1991). Furthermore, as the reason for the *Geesa* court's abandonment of the "outstanding reasonable hypothesis" standard was because it imposed a higher burden of proof on appeal than at trial, *see Brown*, 911 S.W.2d at 746, we must be mindful of the level of proof required at trial when conducting a factual sufficiency review of the elements of the offense. The court in *Clewis*, in enunciating the factual review standard, revealed that it believed the standard "harmonize[d] the criminal and civil jurisprudence of [Texas] with regard to appellate review of questions of factual sufficiency." 922 S.W.2d at 129. In *Hankins*, the court pronounced that in all criminal cases, circumstantial, direct or a combination thereof, "the jury [in determining the verdict] should consider the totality of the direct or circumstantial evidence and the reasonable inferences which may be drawn therefrom, in determining whether it was sufficient to establish guilt beyond a reasonable doubt." 646 S.W.2d at 199. This standard in *Hankins* takes into account who has the burden of proof, what that level of proof is, and the evidence that should be considered in making that determination. *See Clewis*, 922 S.W.2d at 129.

Therefore, in accounting for the State's burden and level of proof at trial, we will take these same factors into consideration in conducting our review of the factual sufficiency of the evidence. *See Geesa*, 820 S.W.2d at 159 ("[T]he sufficiency of the evidence must be measured against the jury charge.").

**B. Factual Sufficiency Review in the Instant Case**

 Desselles contends that the evidence establishes only that the victim somehow lost her hymen prior to Dr. Mahood's examination, not that she was ever sexually assaulted by Desselles. In support of his contention, he refers to evidence that the victim had, prior to the offense, inserted toys into her vagina, which would explain the loss of her hymen, and that she had prior to the offense made accusations of sexual molestation against three different people, which would explain why she accused Desselles of sexually assaulting her.

Schaefer testified that when she examined the victim's vagina on the night of the offense it was "real red," and this fact was confirmed in the report Dr. Mahood made following his examination two days after the offense. Further, Schaefer testified that when she placed the child in her bath water on the night of the offense the child cried and complained that she hurt. The child continued to be upset over the condition of her vaginal area on each of the following two days when she vehemently objected to the efforts of medical personnel to examine her. She protested so stringently that the medical personnel were only able to conduct their examination by sedating her. The child had not protested in the past when she had to take off her pants, although not her underwear, to have a wart removed from her upper, inner thigh by a medical doctor.

On the first of the child's two visits to Darnell Hospital, the child told Schaefer that

---

560 (1979). *Brown*, 911 S.W.2d at 746. As indicated above, the contrary was decided in *Geesa*. The authority for Texas appellate courts to conduct factual sufficiency reviews is derived from our state constitution, not from federal due process concerns. *Clewis v. State*, 922 S.W.2d 126, 129–30 (Tex.Crim.App.1996). Because the

"outstanding reasonable hypothesis" standard was continued to be used after *Hankins* only because of due process concerns, those holdings are not authority for its use under our state constitutional obligation to conduct factual sufficiency reviews in criminal cases. *See Geesa*, 820 S.W.2d at 160–61.

Desselles had hurt her by putting his fingers in her vagina. Goodwin, who was present at the first medical examination, affirmed that the child claimed that Desselles had hurt her.

Schaefer testified that the child's behavior changed dramatically after January 5. She began to have nightmares, threw "bad tantrums," would say to people, "I'm going to kill you, or you're going to die if I ... tell you anything," started to tell people that she had a secret that she could not tell them, and would "act[ ] like a little baby" whenever the subject of the assault was brought up.

Dr. Walraven testified that it would be unusual for a female child not to have an intact hymen until engaging in sexual intercourse. She stated that it is possible for a child's hymen to be perforated prior to engaging in sexual intercourse as a result of certain kinds of accidents, particularly accidents which cause a sharp object to enter the child's vagina. Dr. Walraven further explained, however, that in most accident situations, the hymen is only perforated and not completely removed. The hymen of the victim in the instant case was no longer present at all. On cross-examination, Dr. Walraven testified that there was no evidence of bleeding and that one would expect to find evidence of bleeding if the hymen had been removed within the past twelve hours. On re-direct Dr. Walraven related that the alleged assault actually occurred more than forty-eight hours prior to the examination. Desselles did not ask any questions on recross.

The defense opened its case by calling Flora Lachney to the witness stand. Lachney is Desselles' grandmother and the victim's great-grandmother. Lachney testified that she had in the past bathed the child and that when doing so found the child inserting toys into her vagina. Lachney told Schaefer about the child's actions, but Schaefer refused to believe that the allegations were true. On cross-examination, Lachney testified that when she had been giving the child baths, the child was staying at her house in Marksville, Louisiana. Across the street from Lachney lived Lachney's daughter (Desselles' mother) and Desselles. Lachney testified that the child and Desselles interacted with each other during that time.

The defense's next witness was Desselles' mother, Betty Desselles. Betty testified that for the past five or six years Desselles had lived with her and a man named Leonard Datsat in Marksville, Louisiana, across the street from Lachney. She stated further that for about six or seven months, from May or June 1992 until January 1993, the victim lived in her house, but also during this time both Desselles and Schaefer lived in Covington, Louisiana. In June or July 1993 Schaefer moved to Coryell County, Texas. Schaefer did not immediately take the child with her to Coryell County; instead, she allowed her to remain at Betty's house during the latter part of 1993, and Desselles lived in the same household during this time. Desselles, however, never bathed the child at this or any other time. Betty testified that, while the child was staying with her, she found her inserting toys into her vagina while taking baths and found her pretending to have sexual intercourse with her stuffed animals. Betty reported the incidents to Schaefer, who again denied the truth of the allegations. Betty suggested to Schaefer that the victim was feigning sexual intercourse with her stuffed animals and inserting toys into her vagina because Schaefer had allowed the child to watch her perform sexual acts. When later questioned by the police about the charges against Desselles, Betty commented that, on one of the occasions when she saw the child inserting toys into her vagina, the child explained that Desselles had shown her how to do that. Betty stated that the child had accused three different persons of sexually assaulting her: Datsat, Desselles, and one of Betty's cousins named Barbara. Betty said that Barbara could not have assaulted the child because at the time of the complaint Barbara had not been at Betty's home in a long time, and she said that Desselles could not have assaulted the child because Desselles was living in Covington at the time of the complaint.

Desselles testified during guilt-innocence and denied that he sexually assaulted the child. He admitted that he served twenty-one months in a Louisiana prison on two

charges of attempted aggravated arson, one for trying to burn a car and another for trying to burn a school. He further stated that on the night of the offense the victim accused her six-year old brother of putting his finger in her vagina. He admitted on the date of the offense that he was alone with the victim and that he had been alone on occasion with the child when both of them were living in Marksville, Louisiana.

The State also called Ferguson, the CPS investigator, to the witness stand. She stated that, while interviewing the victim, the victim identified Desselles as the person who had assaulted her. Ferguson further indicated that the victim, during their conversations, exhibited the symptoms of a child who was being truthful in her contention that she had been abused. Some of the factors an investigator with CPS considers in determining the veracity of a child's allegation of assault, stated Ferguson, are how the child reacts when questioned about the abuse and how the child answers questions about the allegation. When asked by Ferguson about her allegation against Desselles, the child became frightened and stated, in response to a question, that she was telling the truth. Upon completing her investigation, Ferguson recommended to Schaefer that the victim receive counseling.

Considering all the evidence in the record, both for and against the verdict, we conclude that the judgment is factually supported by the record. Schaefer noticed that on the date of the offense, the skin surrounding the victim's vagina was "real red," and this fact was confirmed by Goodwin and Dr. Mahood's report. Schaefer also testified that after the assault the victim's manner and mood changed severely. Schaefer's testimony was confirmed by Goodwin's testimony that the victim on the night of offense was upset and crying and Dr. Walraven's testimony that the child resisted so strenuously to her efforts to conduct a genital exam on the day after the offense that a second exam had to be scheduled for the following day when the child could be sedated. Ferguson, a child abuse investigator with several years of experience, testified that the child exhibited the mannerisms that a child who had been abused would typically exhibit in truthfully stating that he or she had been abused.

Desselles did deny that he sexually assaulted the victim, and there was evidence that the victim may have lost her hymen by inserting toys into her vagina. This fact was supported by Dr. Walraven's testimony that there should have been evidence of bleeding if the child had lost her hymen within the past twelve hours. But, to counteract this contention, there was evidence that such evidence would not necessarily be found in this case where the child was examined more than forty-eight hours after the assault and that Desselles may have molested the victim several months earlier when they were both living either in the same house or across the street from each other in Marksville, Louisiana. Moreover, even if Desselles' contention is correct that the child lost her hymen by inserting toys into her vagina, such proof does not eviscerate the affirmative evidence adduced that the victim had been sexually assaulted by Desselles on January 5, 1994.

Upon considering all the evidence, we conclude the verdict was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis,* 922 S.W.2d at 129. Desselles' third point of error is overruled.

The judgment is affirmed.